UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

AMY BICKEL,

    Plaintiff,

  v.                                                           Case No. 18-CV-1296

ANDREW M. SAUL,
**Commissioner of Social Security,**

    Defendant.

---

## DECISION AND ORDER

---

Amy Bickel seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying her claim for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income under the Social Security Act, 42 U.S.C. § 405(g). For the reasons below, the Commissioner's decision is reversed and the case is remanded for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four.

## BACKGROUND

Bickel filed an application for a period of disability and disability insurance benefits and an application for supplemental security income alleging disability beginning on June 1, 2012 due to spine and lower back pain, depression, and anxiety. (Tr. 134.) Bickel's applications were denied initially and upon reconsideration. (Tr. 13.) Bickel filed a request for a hearing and a hearing was held before an Administrative Law Judge on July 27, 2017. (Tr. 35–105.) Bickel testified at the hearing, as did Catherine Anderson, a vocational expert, and Dr. Albert Oguejiofor and Dr. Michael Lace, two medical experts. (Tr. 13.)

In a written decision issued August 25, 2017, the ALJ found that Bickel had the severe impairments of depression and anxiety. (Tr. 15.) While the ALJ considered Bickel's allegations of disabling pain due to her lower back and spine, the ALJ found Bickel had no severe physical impairments. (Tr. 16–19.) The ALJ further found that Bickel did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "listings"). (Tr. 19–21.) The ALJ found Bickel had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with the following nonexertional limitations: no fast pace production tasks; no more than daily quotas; occasional contact with the public, supervisors, and coworkers; and few changes to work locations or tasks. (Tr. 21–26.)

The ALJ found Bickel capable of performing her past relevant work as a cleaner. (Tr. 26.) The ALJ alternatively found that given Bickel's age, education, work experience, and RFC, other jobs existed in significant numbers in the national economy that she could also perform. (*Id.*) As such, the ALJ found that Bickel was not disabled from her alleged onset date until the date of the decision. (Tr. 27.) The ALJ's decision became the Commissioner's final decision when the Appeals Council denied the plaintiff's request for review. (Tr. 1–5.)

## DISCUSSION

### 1. *Applicable Legal Standards*

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (internal quotation and citation

In a written decision issued August 25, 2017, the ALJ found that Bickel had the severe impairments of depression and anxiety. (Tr. 15.) While the ALJ considered Bickel's allegations of disabling pain due to her lower back and spine, the ALJ found Bickel had no severe physical impairments. (Tr. 16–19.) The ALJ further found that Bickel did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "listings"). (Tr. 19–21.) The ALJ found Bickel had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with the following nonexertional limitations: no fast pace production tasks; no more than daily quotas; occasional contact with the public, supervisors, and coworkers; and few changes to work locations or tasks. (Tr. 21–26.)

The ALJ found Bickel capable of performing her past relevant work as a cleaner. (Tr. 26.) The ALJ alternatively found that given Bickel's age, education, work experience, and RFC, other jobs existed in significant numbers in the national economy that she could also perform. (*Id.*) As such, the ALJ found that Bickel was not disabled from her alleged onset date until the date of the decision. (Tr. 27.) The ALJ's decision became the Commissioner's final decision when the Appeals Council denied the plaintiff's request for review. (Tr. 1–5.)

## DISCUSSION

### 1. *Applicable Legal Standards*

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (internal quotation and citation

omitted). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

### *2. Application to this Case*

Bickel argues that the ALJ erred by: (1) improperly evaluating the opinion of her treating psychiatrist, Dr. Raymond Kloss; (2) erroneously formulating Bickel's RFC, specifically the finding that Bickel could perform a full range of work at all exertional levels; and (3) relying on the VE's unreliable testimony. I will address each in turn, but will begin with the second alleged error.

#### 2.1 No Physical Limitations in RFC

At step two of the five-step sequential evaluation for determining whether an individual is disabled, the ALJ determines whether a claimant has one or more medically determinable physical or mental impairments. 20 C.F.R. § 404.1521. An impairment must result from anatomical, physiological, or psychological abnormalities that can be shown by

3

medically acceptable clinical and laboratory diagnostic techniques; thus, a physical or mental impairment must be established by objective medical evidence from an acceptable medical source. *Id.* A plaintiff's statement of symptoms, a diagnosis, or a medical opinion alone will not establish the existence of an impairment. *Id.* After a medically determinable impairment is established, the ALJ then determines whether the impairment is severe. *Id.* An impairment is severe if "it significantly limits an individual's physical or mental abilities to do basic work activities" and is non-severe if it is a slight abnormality "that has no more than a minimal effect on the ability to do basic work activities." Social Security Ruling ("SSR") 96-3p (rescinded effective June 14, 2018). However, in assessing RFC, an ALJ must consider limitations and restrictions attributable to all medically determinable impairments—whether severe or not. SSR 98-6p. Thus, an error at step two can be deemed harmless if the ALJ properly accounted for the limitations in setting RFC, even if he erroneously found an impairment to be non-severe. *Ramos v. Astrue*, 674 F. Supp. 2d 1076, 1091 (E.D. Wis. 2009).

In this case, the ALJ found Bickel's degenerative disc disease to be a medically determinable impairment, but he found the impairment non-severe. (Tr. 16–19.) This was error. The record supports a finding that Bickel's pain from her back condition significantly limits her physical and mental abilities to do basic work activities. In finding the condition non-severe, the ALJ relied heavily on the objective medical evidence of mild spinal abnormalities (Tr. 17–18), as well as the fact that Bickel displayed good physical function during three examinations (Tr. 17). The ALJ also found that the pain management measures Bickel underwent for her back, including medications, injections, radiofrequency ablation, physical therapy, and chiropractic care, generally improved her pain. (Tr. 17.) The ALJ also considered the fact that Bickel sought treatment in the emergency room for low back and right

4

groin pain (*id.*), but dismissed these records because the physical examination at that time was essentially normal and she refused IV pain medication and was discharged in good condition (Tr. 18). Finally, the ALJ rejected the opinion evidence of Bickel's treating chiropractor and the two State Agency physicians—all of whom opined that Bickel had severe physical limitations—in favor of the medical expert who testified at the hearing, Dr. Oguejiofor, who opined that Bickel had no severe physical impairments. (Tr. 18.) The ALJ relied again on the MRIs showing minimal degenerative disc disease and the treatment records showing good physical function in support of his finding. (*Id.*)

It is true that the objective medical evidence of record establishes that Bickel suffers from only mild posterior disc bulging in the lumbar spine and degeneration in the lower lumbar facet joints. (Tr. 603.) Dr. Christopher King, her treating osteopathic physician, noted that the MRI of Bickel's lumbar spine showed only minimal degenerative disc disease (Tr. 665) and an MRI also showed mild/early degenerative changes within the mid/lower cervical spine (Tr. 694). And a few records, as the ALJ points out, show good physical functioning.

However, while a discrepancy between a claimant's reported pain and the degree of pain suggested by the objective medical evidence *may* indicate exaggeration, it is not a certainty. *See Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005). It is only one factor to consider. What the ALJ failed to consider, however, was that Bickel continued to report severe and persistent pain throughout the relevant time period despite undergoing multiple pain management treatments. (Tr. 477, 492, 599, 644, 655, 702, 714, 994, 1020.) Bickel's pain was severe enough at times to limit her mobility and make it difficult to complete her daily activities and care for her family. (Tr. 843.) Bickel's chronic pain also contributed to her depression. (Tr. 683, 1002–03, 1009, 1020.) Further, while a few records showed good

5

physical functioning, the ALJ failed to consider the multiple records showing tenderness, limited flexion and extension, an antalgic gait, and positive straight leg raise. (Tr. 475, 477, 485, 635, 715.) Even when Bickel was working, she needed to take a lot of breaks due to the pain (Tr. 635) and ultimately had to quit her job due to pain (Tr. 824). These records indicate that Bickel's pain from her back condition does indeed significantly limit her physical and mental abilities to do basic work activities.

As stated above, however, an error at step two may be deemed harmless if the ALJ considered the claimant's limitations from the medically determinable impairment in formulating the RFC. The ALJ stated that the "evidence does not support a finding of any additional functional limitations other than those determined herein" (Tr. 19) and the decision is devoid of any consideration of her physical limitations due to back pain. While the ALJ briefly considered how her chronic pain affected her mood, citing two records from her treating psychiatrist, the ALJ ultimately concluded that Bickel's pain regimen was effective against the pain. (Tr. 23.)

The ALJ underestimates and undervalues the extent the records support Bickel's chronic pain and thus fails to properly include limitations due to pain in the RFC. Bickel began to complain of back pain in late 2013. (Tr. 776, 778–79.) In September 2014, Bickel slipped and fell, landing on her left hip. (Tr. 634.) Her right side began to bother her a few days after that. (*Id.*) Bickel reported hip pain that was intermittent and moderately severe in October 2014. (Tr. 475.) Upon physical examination, Bickel showed mild tenderness over the right lumbar paraspinal insertions and the right sciatic notch and her straight leg raise was slightly abnormal on the right. (*Id.*) Her treating doctor recommended exercises, cold packs, medication, and physical therapy. (Tr. 476.)

6

Bickel began physical therapy in November 2014, reporting that she needed extra time to complete her work because of her pain. (Tr. 634.) Bickel complained of persistent, moderately severe right lower lumbar pain, and upon physical examination, straight leg raising on the right caused a very slight right lower back pain. (Tr. 477.) Throughout the remainder of 2014, Bickel reported daily hip pain and lower back pain radiating down her right leg. (Tr. 481, 599, 805, 810.) Her physical therapists noted that she appeared uncomfortable and walked with an antalgic, slow, and guarded gait. (Tr. 551, 555.) Bickel had her first lumbar facet injection in December 2014. (Tr. 606.) By March 2015, Bickel reported that she had to quit her job due to pain. (Tr. 824.) Throughout early to mid-2015, Bickel reported persistent and severe back pain. (Tr. 617, 622, 627, 644, 826, 831.) In June, she underwent another lumbar facet injection and a right lumbar radiofrequency ablation. (Tr. 622, 627.) By July 1, however, Bickel was crying on the telephone when speaking to a nurse, saying that she continued to have pain and that "nothing is helping. I feel dysfunctional. I didn't know it would be this bad." (Tr. 1207.) On July 10, Bickel presented to the emergency room with complaints of lower back and right groin pain. (Tr. 1217.) She reported two episodes of fecal incontinence because her back pain prevented her from getting to the bathroom. (Tr. 1518.)

After Bickel's July visit to the emergency room, she was referred to a spine specialist. (Tr. 646.) Bickel treated with Dr. Padmaja Doniparthi on July 24, 2015 for her "chronic persistent back pain." (Tr. 680.) Dr. Doniparthi noted that Bickel experienced no pain relief from the lumbar facet injections, medial branch blocks, or the right lumbar radiofrequency ablation. (*Id.*) Tylenol with codeine initially provided minimal relief, and Bickel had no relief with hydrocodone. (*Id.*) The record noted that Bickel was "quite tearful and expressed her

7

frustration with the degree of pain relief she [was] experiencing." (*Id.*) When discussing her options, Dr. Doniparthi counseled Bickel regarding the use of narcotics on a long-term basis for chronic pain; however, as she did not respond to the ablation or facet joint injections, the doctor stated that "[a]t this point, I did not recommend any further injections or interventions." (Tr. 681.) Bickel stated that she would like to see a surgeon "to see if this can be 'fixed.'" (*Id.*) After encouraging Bickel to use narcotics only sparingly, Dr. Doniparthi noted that Bickel was "in agreement with treatment plan although she did not appear satisfied with the explanation at the time of her discharge here." (*Id.*)

In August 2015, Bickel presented to the emergency room with suicidal ideation, stating that she felt "worthless" because she "lives in pain and is unable to help her kids and family." (Tr. 683.) About a week later, Bickel called the nurse requesting stronger pain medication, stating that her pain was very severe and she was getting no relief from hydrocodone. (Tr. 1281.) She was given oxycodone, but her doctor noted that he would "hate this to be a chronic med for her if not necessary." (Tr. 1286.)

Bickel treated with Dr. King on September 15, 2015. Dr. King noted that Bickel's low back pain appeared "to be arising from right lower lumbar facets. Leg pain may be due to sciatic nerve contusion." (Tr. 666.) Bickel attended a consultation with a chiropractor on September 21, 2015. (Tr. 714.) Upon physical examination, the chiropractor noted a fifty-degree straight leg raise on the left with very severe low back pain and a forty-degree straight leg raise on the right with remarkably severe low back pain. (Tr. 715.) The very next day, Bickel was recorded as sobbing on the phone to the nurse, stating "I need something for this pain." (Tr. 1299.)

8

Bickel treated with the chiropractor in September 2015 and treated frequently until the end of the year. (Tr. 1567–83.) Throughout this time period, Bickel's pain seemed to increase with stress, but she did experience some pain relief. In October she noted improvement, even stating that it was the "best she's felt in a long time," (Tr. 720) and the "best she's felt in years" (Tr. 724), despite continuing to experience significant pain and stiffness (Tr. 720, 724). Bickel treated with Dr. King on November 10, 2015. (Tr. 1098.) Dr. King noted that Bickel's pain symptoms were unchanged from the last visit, but that he felt that "a large portion of her symptoms [were] likely a consequence of anxiety disorder." (Tr. 1099.) While the chiropractor noted on December 16, 2015 that Bickel was "improving excellently" (Tr. 1582), Bickel's treating therapist, Christel Kwait, LCSW, noted on December 23, 2015 that Bickel was "doing poorly, [c]ontinues to have chronic pain in back and groin area," and was smoking marijuana every other day for the past month and a half to help with sleep and pain (Tr. 999). Several days later, Bickel's psychiatrist, Dr. Kloss, similarly noted that Bickel was distressed about her hip and back pain and feared that her doctors would think she "[was] looking for pills" when she was simply "looking for relief from her pain." (Tr. 1002.) Dr. Kloss noted that contrary to Dr. King's assessment, Bickel's chronic pain was not a function of her depression but was a separate and primary problem. (Tr. 1003.) Dr. Kloss stated that he would send a message to Dr. King that Bickel's "pain is primary and depression secondary." (*Id.*)

In early February 2016, Bickel continued to report to her mental health providers that she was experiencing pain with little relief from physical therapy. (Tr. 1006.) She told Dr. Kloss that she was using marijuana for pain and was walking with difficulty. (Tr. 1009.) Dr. Kloss noted that Bickel's depression was worsening with the increase in pain and that because

9

her neurosurgeon could not find any clear pathology for treatment, she was referred to a pain clinic. (Tr. 1009–10.) Bickel wept when speaking to Kwait about her "continued struggles with pain and no answers of what may be wrong." (Tr. 1011.)

Bickel returned to Dr. Doniparthi and to the chiropractor in April 2016. Dr. Doniparthi performed a sacroiliac joint injection. (Tr. 1478.) The chiropractor noted that Bickel's low back pain that was "considerabl[y] worsening . . . since the last visit." (Tr. 1583.) In June, Bickel reported to Dr. Kloss that she began taking naproxen for pain and that it was "helping a little." (Tr. 1023.) Thus, Dr. Kloss noted that her chronic pain was "more stable" with the change in treatment and that her current medical regimen was effective. (Tr. 1024.) Throughout the remainder of 2016, Bickel continued to report back pain, especially with stress, but not as severe. (Tr. 1025, 1028, 1034, 1036, 1583–87.) However, by December 2016, Bickel presented to Kwait and wept throughout the session, stating that she was kicked out of the pain management clinic for excessive no-shows. (Tr. 1038.) Bickel continued to report pain throughout the beginning of 2017, when the medical records end. (Tr. 1048, 1059.)

Again, the ALJ fails to properly consider Bickel's pain complaints associated with her back. The ALJ focuses primarily on the mild objective findings and the few normal physical examinations. The ALJ cherry-picks certain records (such as the statement to the chiropractor that "this is the best she's felt in years") to support his finding that Bickel's back impairment is not severe. But reviewing the record as a whole, it shows that Bickel was experiencing serious pain despite the relatively mild objective findings. Bickel thrice called a nurse stating that she needed something for her pain (twice while sobbing). She went to the emergency room because of the pain. Bickel's pain was "severe enough at times that she ha[d] limited mobility and . . . a hard time doing her daily activities or caring for her family." (Tr. 843.) She

experienced fecal incontinence because pain limited her ability to reach the bathroom in time. Bickel felt depressed because of her pain. Bickel felt suicidal because of the pain. Even her marijuana use, which she stated she used for pain and began after other treatment options failed, shows her level of desperation to obtain pain relief. But the ALJ does not even grapple with Bickel's pain complaints, because he finds her back impairments to be non-severe. This was error. Both Bickel's treating providers and the State Agency physicians opined physical limitations due to her back pain, hip pain, and degenerative disc disease. (Tr. 115, 146, 1512–14.) And there is ample evidence in the record to support physical limitations due to back pain. While the Commissioner argues this failure is harmless because the VE identified two jobs that someone with Bickel's mental limitations could perform who was also limited to light work (Tr. 69–70), the RFC does not account for specific limitations the State Agency physicians opined, such as difficulty stooping and crouching (Tr. 127).

On remand, as sated above, the ALJ must remember that a discrepancy between a claimant's reported pain and the degree of pain suggested by the objective medical evidence is only one factor to consider. *See Sienkiewic*, 409 F.3d at 804. It does not make it a foregone conclusion that a claimant is exaggerating her pain. And the regulations specifically instruct that a claimant's statements about the intensity of her pain cannot be disregarded solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms she alleges. SSR 16-3p. The ALJ must properly evaluate Bickel's symptoms pursuant to SSR 16-3p.

### 2.2 Weight Given to Dr. Kloss' Opinion

Bickel argues the ALJ erred in the weight given to the opinion of her treating psychiatrist, Dr. Kloss. An ALJ must consider all medical opinions in the record, but the

method of evaluation varies depending on the source. Generally, more weight is given to the medical opinions of treating sources. 20 C.F.R. § 404.1527(c)(2).[1] If the opinion of a treating source is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record, the opinion is given "controlling weight." *Id.* Even if the ALJ finds that the opinion is not entitled to controlling weight, he may not simply reject it. SSR 96-2p. Rather, if the ALJ finds that a treating source opinion does not meet the standard for controlling weight, he must evaluate the opinion's weight by considering a variety of factors, including the length, nature and extent of the claimant and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; and whether the doctor is a specialist. 20 C.F.R. § 404.1527(c).

The ALJ must always give good reasons for the weight given to a treating physician's opinion. 20 C.F.R. § 404.1527(c)(2); SSR 96-2p. The ALJ must give reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p. An ALJ can reject a treating physician's opinion only for reasons supported by substantial evidence in the record. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).

---

[1] On January 18, 2017, the SSA published the final rules entitled "Revisions to Rules Regarding the Evaluation of Medical Evidence" in the Federal Register (82 FR 5844). The final rules became effective on March 27, 2017. For claims filed before March 27, 2017, however, the SSA continues to apply the prior rules that were in effect at the time of the ALJ's decision. https://www.ssa.gov/disability/professionals/bluebook/revisions-rules.html (last visited Aug. 29, 2019).

Further, the regulations governing the evaluation of disability for disability insurance benefits and SSI are nearly identical; thus, I will generally refer to the regulations for disability insurance benefits found at 20 C.F.R. § 404.1520, *et seq.* for ease of reference.

Dr. Kloss treated Bickel frequently throughout the relevant time period. He completed two mental impairment questionnaire forms, one on September 9, 2015 (Tr. 659–61) and one on April 13, 2017 (Tr. 834–36). Dr. Kloss opined that Bickel was markedly restricted in her activities of daily living; maintaining social functioning; and concentration, persistence, or pace; and had experienced three episodes of decompensation within a twelve-month period, each of at least two weeks duration. (Tr. 660, 835.) He opined Bickel would miss about four days of work per month due to her impairments or treatment. (Tr. 661, 836.)

The ALJ afforded little weight to Dr. Kloss' opinion, finding that: the serious limitations set forth in the form were inconsistent with the treatment records showing fairly good mental functioning; Dr. Kloss noted at times that her conditions were stable and mild; and his assessment about absenteeism from work appeared to be speculative. (Tr. 24.) But the ALJ's citation to three random records showing times where Bickel displayed "fairly good mental function" is the essence of cherry-picking. The ALJ ignores the records from both Dr. Kloss and Kwait where Bickel is crying in the waiting room and weeping throughout the appointment. (Tr. 492, 646, 650, 807, 815, 964, 999, 1004, 1015, 1036, 1038, 1045.) Bickel reported having to stop her car because she was crying. (Tr. 814.) She would cover her face while interacting with medical providers. (Tr. 590, 1056.) While the ALJ points out records from Dr. Kloss showing Bickel had good hygiene, he ignores Kwait's record showing that Bickel had not showered since their last session, two weeks prior. (Tr. 1015.) The ALJ does not consider the fact Kwait recommended on multiple occasions that Bickel participate in an out-patient "partial hospitalization program" because of her increased depression and poor ability to cope. (Tr. 815, 817, 1017.) Nor does the ALJ consider the fact that Bickel presented to multiple other health care providers crying on numerous occasions. (Tr. 481, 713, 850,

1207, 1299.) And while Dr. Kloss did call her depression mild "at times," he also described it as moderate on more than one occasion. (Tr. 1035, 1042.) Bickel also got into a fight with her boyfriend and cut her arm with a razor, creating lacerations that required suturing. (Tr. 1434–40.) All of these records undermine the ALJ's finding that Bickel displayed "fairly good mental function throughout the period at issue." (Tr. 24.)

Regarding the ALJ's finding that Dr. Kloss' absenteeism opinion (which Kwait shares) is speculative, on remand, the ALJ should consider the fact that Bickel was discharged from physical therapy (Tr. 810) and pain management (Tr. 1038) for excessive no-shows and arrived significantly late or no-showed to multiple appointments with Kwait (Tr. 873, 909, 944, 949, 95, 966, 991, 998, 1004, 1017, 1045, 1058). Kwait noted, for example, that Bickel was forty-three minutes late for her appointment and was crying in the waiting room, stating that she had a very difficult morning. (Tr. 1004.) It is possible that both mental health providers' opinions regarding Bickel's absenteeism is based not on speculation but on observation of her behavior.

For these reasons, I find the ALJ erred in his assessment of Dr. Kloss' opinion and must reconsider it on remand.

### 2.3 Reliance on VE's Testimony

Finally, Bickel argues the ALJ erred when he relied on the VE's conflicting and therefore unreliable testimony. Specifically, when questioning the VE, the ALJ stated the hypothetical individual should be "limited to very brief and very superficial occasional contact with the public, supervisors, and co-workers." (Tr. 68.) Bickel's attorney asked the VE whether the jobs would require evaluation, supervision, and feedback given to the employee, to which the VE responded affirmatively, especially during the probationary period. (Tr. 72.)

Counsel questioned what the ALJ meant by "very brief, very superficial, and occasional contact," questioning whether "very superficial" meant limiting the contact to information that is not job-related. (Tr. 73.) Counsel, the ALJ, and the VE debated the meaning of "superficial" for a length of time (Tr. 88–92), but the ALJ ultimately did not include "superficial" in the RFC (Tr. 21). Bickel argues that given her stated fear of authority figures and general anxiety (Tr. 332), she would not be able to perform a job that required learning through observing a supervisor, receiving evaluations, and receiving feedback.

Because this case is being remanded for other reasons that will likely change the RFC and thus the hypothetical given to the VE, I will not address this argument further. However, I will note that the ALJ must be sure to include all of Bickel's limitations supported by the medical record in the hypothetical posed to the VE. *See Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014).

## CONCLUSION

Bickel argues that the ALJ erred by failing to provide restrictions for her physical limitations in the RFC, by improperly weighing the opinion evidence of her treating psychiatrist, and by relying on unreliable VE testimony. I find the ALJ's decision is not supported by substantial evidence; thus, reversal and remand are required consistent with this decision.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the Commissioner's decision is **REVERSED**, and the case is **REMANDED** for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 30th day of August, 2019.

BY THE COURT

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge